No. 23-3874

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

GARRY MATTHEWS, ET AL.,
*Plaintiffs-Appellants,*

v.

CITY OF LOS ANGELES, ET AL.,
*Defendants-Appellees.*

_____

On Appeal from the
United States District Court for the Central District of California
Case No. 2:22-cv-02944-FLA-PD
Honorable Fernando L. Aenlle-Rocha

_____

## BRIEF OF AMICI CURIAE CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, SECOND AMENDMENT LAW CENTER, INC., THE SECOND AMENDMENT FOUNDATION, AND MINNESOTA GUN OWNERS CAUCUS IN SUPPORT OF APPELLANTS AND REVERSAL

_____

C. D. Michel
Anna M. Barvir
Konstadinos T. Moros
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com

*Counsel for Amici Curiae*

October 15, 2024

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for amici curiae certify that California Rifle & Pistol Association, Incorporated, Second Amendment Law Center, Inc., The Second Amendment Foundation, and Minnesota Gun Owners Caucus are nonprofit organizations and thus have no parent corporations and no stock.

Date: October 15, 2024                    MICHEL & ASSOCIATES, P.C.

/s/ C.D. Michel
C.D. Michel
*Counsel for Amici Curiae*

i

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement..................................................................... i

Table of Contents............................................................................................ ii

Table of Authorities ...................................................................................... iii

Interest of Amici Curiae ................................................................................. 1

Introduction .................................................................................................... 2

Argument......................................................................................................... 3

I.     It Would Have Been Impossible for Appellants to Have Obtained CCW Permits at the Time of Their Arrests ...................................................... 3

II.    No Historical Tradition supports the Requirement that Nonresidents Obtain a License to Carry Before Carrying a Firearm Publicly for Self-Defense .............. 7

        A.    The Second Amendment Historical Analysis Under *Bruen*....................... 7

        B.    The District Court Failed to Conduct a Historical Analysis; If It Had, It Would Have Found That Nonresidents Have Historically Not Been Required to Seek Permission Before Peaceably Carrying a Firearm ....... 11

III.   Americans Who Legally Carry Are An Extraordinarily Law-abiding Demographic.............................................................................................. 16

Conclusion..................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bianchi v. Brown,*
   111 F.4th 438 (4th Cir. 2024) ....................................................... 16

*Bliss v. Com.,*
   12 Ky. 90 (1822) ............................................................................ 12

*Cal. Rifle & Pistol Ass'n, Inc. v. L.A. Cnty. Sheriff's Dep't,*
   No. 23-cv-10169 (C.D. Cal. Aug. 20, 2024) ................................. 4

*Carr v. State,*
   34 Ark. 448 (1879) ....................................................................... 15

*Commonwealth v. Donnell,*
   No. 2211CR2835 (Mass. Dist. Ct. Aug. 3, 2023) ......................... 11

*Desert Outdoor Advert., Inc. v. City of Moreno Valley,*
   103 F.3d 814 (9th Cir. 1996) ......................................................... 5

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ................................................................ 7, 10

*Doster v. Cty. of San Diego,*
   203 Cal.App.3d 257 (1988) ........................................................ 5, 6

*Drummond v. Robinson Twp.,*
   9 F.4th 217 (3d Cir. 2021) ............................................................. 8

*Espinoza v. Mont. Dep't of Revenue,*
   591 U.S. 464 (2020) ..................................................................... 10

*Gamble v. United States,*
   139 S. Ct. 1960 (2019) ................................................................. 10

*Heller v. District of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011) ................................................... 10

*Koons v. Platkin,*
   673 F. Supp. 3d 515 (D.N.J. 2023) .............................................. 20

*May v. Bonta,*
   No. 23-cv-01696, 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023) .......... 20

*New York State Rifle & Pistol Ass'n Bruen,*
    597 U.S. 1 (2022) ..................................................................passim

*Shuttlesworth v. City of Birmingham,*
    394 U.S. 147 (1969) ...................................................................... 7

*United States v. Jones,*
    565 U.S. 400 (2012) .................................................................... 10

*United States v. Rahimi,*
    602 U.S. __, 144 S. Ct. 1889 (2024) ................................3, 8, 9, 15

*Wolford v. Lopez,*
    686 F. Supp. 3d 1034 (D. Haw. 2023) ........................................ 20

*Wrenn v. D.C.,*
    864 F.3d 650 (D.C. Cir. 2017) ..................................................... 6

## Statutes

1813 Ky. Acts 100, *An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases,* ch. 89, § 1 ....................................... 12

1819 Ind. Acts 39, *An Act to Prohibit the Wearing of Concealed Weapons* ........................... 12

1821 Tenn. Pub. Acts 15-16, *An Act to Prevent the Wearing of Dangerous and Unlawful Weapons,* ch. 13................................................................................ 13

1840 Ala. Laws 149 ........................................................................... 13

1883 Ariz. Sess. Laws 21-22 ............................................................. 13

23 *The Grants, Concessions, and Original Constitutions of the Province of New Jersey* (1758).... 12

*An Act to Prohibit Carrying of Concealed Weapons,* ch. 30, Nev. Stat. (Joseph E. Eckley) . 13

*An Ordinance to Prohibit the Carrying of Concealed Weapons,* No. 1141 ................................ 14

Button, Fred L., ed., *General Municipal Ordinances of the City of Oakland, California* (Oakland, CA; Enquirer, 1895) ....................................................... 14

Cal. Penal Code § 26150 .................................................................... 4

Cal. Penal Code § 26155 .................................................................... 4

Cal. Penal Code § 26202 .................................................................. 16

iv

Cal. Penal Code § 26150 ................................................................................. 16

Cal. Penal Code § 26165 ................................................................................. 16

Cal. Penal Code § 26190 ................................................................................. 16

Hittell, Theodore Henry, *The General Laws of the State of California, from 1850 to 1864*, (1868) ............................................................................................................. 13

Ordinance no. 84, *Charter and Ordinances of the City of Sacramento, Prohibiting the Carrying of Concealed Deadly Weapons* (1876) ...................................................... 14

*Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles* 83 (Wm. M. Caswell ed., 1878) ....................................................................................... 14

*The Revised Statutes of Texas* 42-43 (1879) ................................................... 13

## Other Authorities

2 James Kent, *Commentaries on American Law* 340 n.2 (O.W. Holmes, Jr. ed., 12th ed. 1873) ............................................................................................................. 15

*Active License/Certified Instructor Counts as of December 31, 2020*, Tex. Dep't of Pub. Safety, https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/actlicandinstr/activelicandinstr2020.pdf (last accessed Sept. 15, 2024) ............................... 17

*BCA Releases 2023 Permit to Carry Annual Report, Data Provided to BCA by Minnesota Law Enforcement* Agencies, Minn. Dep't of Pub. Safety (Mar. 1, 2024), https://dps.mn.gov/divisions/ooc/news-releases/Pages/BCA-Releases-2023-Permit-to-Carry-Annual-Report.aspx (last accessed Sept. 30, 2024) ...................... 19

*BCA Releases 2023 Uniform Crime Report*, Minn. Dep't of Pub. Safety (Aug. 15, 2024), https://dps.mn.gov/divisions/ooc/news-releases/Pages/BCA-releases-2023-Uniform-Crime-Report.aspx (last accessed Sept. 30, 2024) ............................... 19

*Concealed Weapon or Firearm License Summary Report Oct. 1, 1987-Aug. 31, 2024*, Fla. Dep't of Agric. & Consumer Servs., Div. of Licensing (June 30, 2023), https://ccmedia.fdacs.gov/content/download/7499/file/cw_monthly.pdf (last accessed Sept. 15, 2024) ..................................................................................... 17

*Conviction Rates for Handgun License Holders, Reporting Period: 01/01/2020 – 12/31/2020*, Tex. Dep't of Pub. Safety (Feb. 11, 2021), https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/convictionratesreport2020.pdf (last accessed Sept. 15, 2024) ................................. 17

Cramer, Clayton E. & David B. Kopel, "Shall Issue": The New Wave of Concealed Handgun Permit Laws, 62 Tenn. L. Rev. 679 (1995) .................................................. 18

*Department of Justice Concealed Carry Annual Report - 175.60(19): January 1-December* 31, 2022, Wisc. Dep't of Just., https://www.doj.state.wi.us/sites/ default/files/dles/ccw/2022%20Annual%20CCW%20Statistical%20Report.pdf (last accessed Sept. 15, 2024) ........................................................................................ 20

Gould, Josiah, *A Digest of the Statutes of Arkansas* 381-82 (1858) .................................... 13

Leonard, Eric, *LAPD Asks to Cancel Citizens' Concealed Weapo*ns Permits, NBC L.A. (March 28, 2019), available at https://www.nbclosangeles.com/news/lapd-asks-to-cancel-citizens-concealed-weapons-permits/137623/ (last accessed Sept. 25, 2024) ........................................................................................................................... 6

Ray, Lexis-Olivier, *Concealed Carry Firearm Permits Soar More Than 42,000% in Los* Angeles, L.A. Taco (June 5, 2024), available at https://lataco.com/concealed-carry-firearm-permit-los-angeles (last accessed Sept. 25, 2024) ........................................... 6

Rosenberg-Douglas, Katherine, *Explore: Shootings by CCL Holders in Illinois Since Concealed Carry Law Went Into Effe*ct in 2014, Chic. Trib. (Mar. 1, 2020), https://www.chicagotribune.com/news/breaking/ct-viz-illinois-ccl-shootings-tracker-20200227-ww4ldq ........................................................................................ 18

Smart, Rosanna, et al., *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effect of Gun Policies in the Uni*ted States, (4th ed. 2024), available online at https://www.rand.org/pubs/research_reports/RRA243-9.html (last accessed Sept. 27, 2024) ........................................................................................................... 20

Smith, Mark W., *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 24 Harvard J.L. & Pub. Pol'y Per Curiam 31 (2022) ........................................ 11

*Texas: 2020 Census, Texas Added Almost 4 Million People in Last Decade*, U.S. Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/texas-population-change-between-census-decade.html (last accessed Sept. 15, 2024) ......................................................................................................................... 17

### INTEREST OF AMICI CURIAE[1]

Founded in 1875, California Rifle and Pistol Association, Incorporated, is a nonprofit organization that seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. In service of its mission to preserve the constitutional and statutory rights of gun ownership, California Rifle and Pistol Association regularly participates as a party or amicus in firearm-related litigation.

Second Amendment Law Center, Inc. is a nonprofit corporation headquartered in Henderson, Nevada. Second Amendment Law Center is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States. It also seeks to educate the public about the social utility of firearm ownership and to provide accurate historical, criminological, and technical information about firearms to policymakers, judges, and the public.

The Second Amendment Foundation is a non-profit membership organization founded in 1974 with over 720,000 members and supporters in every state of the union. Its purposes include education, research, publishing, and legal action focusing on the constitutional right to keep and bear arms.

Minnesota Gun Owners Caucus ("MGOC") is a 501(c)(4) non-profit organization incorporated under the laws of Minnesota with its principal place of business in Shoreview, Minnesota. MGOC seeks to protect and promote the right of

---

[1] The parties have given their consent to the filing of this brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

1

citizens to keep and bear arms for all lawful purposes. MGOC serves its members and the public through advocacy, education, elections, legislation, and legal action. MGOC's members reside both within and outside Minnesota.

Together, Amici California Rifle & Pistol Association and The Second Amendment Foundation are also associational plaintiffs in a case challenging, among other issues, California's effective ban on nonresidents carrying firearms in this state. Recently, they won a preliminary injunction against the practice, and California will soon need to begin issuing permits to residents of other states who apply and qualify for one. Due to their extensive prior litigation and briefing on this topic, Amici's perspective may be useful to this Court as it considers this appeal.

## INTRODUCTION

This case is simple. No historical tradition supports California's modern requirement that peaceable nonresidents—who are already permitted to carry firearms in their home states—submit to a burdensome process to obtain a California license to carry ("CCW permit") if they wish to exercise their Second Amendment rights while visiting or passing through the state. On the contrary, laws historically exempted travelers from such local restrictions on their right to defend themselves while traveling. Americans of earlier eras knew that requiring citizens visiting another state to give up the right to bear arms was untenable.

Even if Mr. Matthews *wanted* to go through the time and trouble of getting a California CCW permit, *it would have been both legally and practically impossible for him to do so.* The California Penal Code, even today, only allows issuing authorities to grant CCW permits to residents of California unless the nonresident applicant is regularly present

2

in the state due to their employment.[2] Those laws will soon be the subject of a preliminary injunction Amici won in their own litigation, and California will finally have to allow nonresidents to apply for California CCW permits. But that preliminary injunction has not yet gone into effect. And it was certainly not in place when Mr. Matthews was arrested in 2019.

After an explanation of the reasons why the Appellants could not have gotten CCW permits from Appellees, this brief will discuss the relevant standards under *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022) and *United States v. Rahimi*, 602 U.S. __, 144 S. Ct. 1889 (2024), and how Los Angeles fails to meet them as to Appellant Matthews specifically. It will also counter the "parade of horribles" the City is likely to trot out by presenting data from several states showing that Americans who legally carry are overwhelmingly law-abiding. No harm will result from allowing people like Mr. Matthews, who can (and do) carry in their home states, to also carry in California.

## ARGUMENT

### I. IT WOULD HAVE BEEN IMPOSSIBLE FOR APPELLANTS TO HAVE OBTAINED CCW PERMITS FROM APPELLEES AT THE TIME OF THEIR ARRESTS

While the Second Amendment analysis is clearly in Mr. Matthews's favor as Amici will discuss below, this Court may not need to reach that question because neither

---

[2] The other Appellants, too, would have been unable to obtain CCW permits at the time of their arrest, as LAPD had issued permits to only four people in the whole city before 2022.

he nor the other Appellants would have been able to get a CCW permit at the time of their arrests.

The facts are most clear for Mr. Matthews, who at all relevant times was a resident of Tennessee. Under California law, both now and at the time of his arrest in 2019, local issuing authorities may only grant CCW permits to "a resident of the county or a city within the county," or those with a business or employment in the county, so long as they spend a "substantial period of time" in that place of business or employment. *See* Cal. Penal Code § 26150(a)(3); *see also id.* § 26155(a)(3). Mr. Matthews was a resident of Tennessee when he was arrested. As such, it would have been impossible for him to get a California CCW permit, given he was not a resident of California and there is nothing in the record proving that he was employed in the state. LAPD would have had no legal authority to issue him a permit even if the Police Chief wanted to do so (and as will be shown, he absolutely did not).

Even after *Bruen* confirmed a general right to publicly carry firearms for self-defense, it is still impossible for nonresidents to get a California CCW permit. That will finally change soon, thanks to Amici's success in recent litigation on this issue. *See* Order at 31-37, *Cal. Rifle & Pistol Ass'n, Inc. v. L.A. Cnty. Sheriff's Dep't*, No. 23-cv-10169 (C.D. Cal. Aug. 20, 2024), ECF No. 52 (granting preliminary injunction as to nonresident carry issue because California had "failed to demonstrate that it is likely that its residency requirement to apply for a CCW license is part of a historical tradition of this Nation"). The implementing order laying out how nonresidents are to apply for California CCW permits has not yet been issued as of the date of filing of this brief. It was thus obviously not in effect when Mr. Matthews was arrested in 2019.

4

Focusing only on the unconstitutional "good cause" requirement then in place, the district court stressed that Mr. Matthews and the other plaintiffs had not even applied for a CCW permit. 1-ER-10-11. The district court's view was apparently that Mr. Matthews should have had to go through the pointless exercise of applying for a permit and getting an inevitable denial before he could challenge the law's "good cause" requirement. *Id.* But Mr. Matthews would not have been denied just for lack of "good cause", the excuse Appellees were using to deny applicants generally. His application would have also been rejected because he was not a resident of California, the same situation confronting one of the individual plaintiffs in Amici's case. *See* Order at 6, *Cal. Rifle & Pistol Ass'n, Inc. v. L.A. Cnty. Sheriff's Dep't*, No. 23-cv-10169 (C.D. Cal. Aug. 20, 2024), ECF No. 52 ("Plaintiff Hoover holds a CCW license from Florida, applied for a CCW license in California, but was deemed ineligible because he is not a California resident.").

Mr. Matthews was under no obligation to apply for a permit that would not be issued to him before suing over his unconstitutional arrest. Indeed, it is well established under both California and federal law that futile acts are not required to establish standing. *See, e.g., Desert Outdoor Advert., Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996) ("Desert and OMG also have standing to challenge the permit requirement, even though they did not apply for permits, because applying for a permit would have been futile."); *see also Doster v. Cty. of San Diego*, 203 Cal.App.3d 257, 262 (1988) (the law does not require "futile acts"). The district court erred in either ignoring or not recognizing this futility exception. Appellees should have never enforced the law against Mr. Matthews and are liable to him for any resulting damages.

5

While Mr. Matthews was barred from receiving a permit *de jure*[3] he was also, like the other two Appellants, Messrs. Hunn and Hearns, barred from doing so *de facto*. Even if he had established residency in California, he still would not have gotten a CCW permit from Appellees. Before *Bruen*, LAPD did not issue CCW permits to almost anyone—whether residents or not. In fact, then-Chief Michel Moore had even moved to cancel the few remaining permits still in civilian hands.[4] Before 2022, there were only *four*[5] active CCW permits issued by LAPD in Los Angeles, despite the city having a large population of 3.8 million people. *See* Lexis-Olivier Ray, *Concealed Carry Firearm Permits Soar More Than 42,000% in Los Angeles*, L.A. Taco (June 5, 2024), available at https://lataco.com/concealed-carry-firearm-permit-los-angeles (last accessed Sept. 25,

---

[3] That Mr. Matthews was a nonresident and ineligible for a California CCW permit does not mean that Appellees were right to arrest him for carrying without a permit. As will be shown, aside from the legal and practical impossibility of him getting a permit from Appellees, there is also a historical tradition of not enforcing carry restrictions against travelers. His arrest thus violated the Second Amendment.

[4] *See* Eric Leonard, *LAPD Asks to Cancel Citizens' Concealed Weapons Permits*, NBC L.A. (March 28, 2019), available at https://www.nbclosangeles.com/news/lapd-asks-to-cancel-citizens-concealed-weapons-permits/137623/ (last accessed Sept. 25, 2024). A group of 30 people had obtained CCW permits as a result of a 1994 lawsuit settlement, and the permits were renewed over the years. *Id.* But Moore asked a court to vacate the settlement and cancel the permits because it was "restricting Moore's ability to exercise his discretion in deciding who is entitled to a CCW license," even though the Chief cited no examples of any of these individuals committing any crimes. *Id.*

[5] The fact that a privileged few were issued CCW permits does not make the policy at the time acceptable. *See Wrenn v. D.C.,* 864 F.3d 650, 666 (D.C. Cir. 2017) ("[T]he good-reason law isn't a 'total ban' *for the D.C. population as a whole* of the right to bear common arms under common circumstances. After all, it allows some D.C. residents—those with a special need—to defend against threats both common to everyone *and* specific to themselves. But the ban on ownership struck down in *Heller I* also made "minor exceptions" for certain sorts of owners, who could then defend their homes to the hilt…That made no difference to constitutional review of the ban.").

2024). The idea that any of the Appellants could have obtained a permit if only they had applied is simply absurd.

While the rest of this brief will focus on Mr. Matthews's particular situation as a nonresident of California, this Court should not ignore the plight of the other Appellants. Their Second Amendment rights were violated when they were arrested for carrying firearms in a city whose police chief effectively did not issue CCW permits. They had no legal avenue to exercise their right to carry, and applying with Chief Moore would have been futile. In the free speech context, an individual "faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969). The same principle should apply here, and the law should have never been enforced against any of the Appellants in these circumstances.

## II. NO HISTORICAL TRADITION SUPPORTS THE REQUIREMENT THAT NONRESIDENTS OBTAIN A LICENSE TO CARRY BEFORE CARRYING A FIREARM PUBLICLY FOR SELF-DEFENSE

### A. The Second Amendment Historical Analysis Under *Bruen*

In 2022, the Supreme Court reaffirmed the "original public meaning test" for analyzing Second Amendment challenges first articulated in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Applying this test, the Court in *Bruen* held that the Second Amendment protects the right to armed self-defense in public. 597 U.S. at 19, 31-33. *Bruen* also reiterated that courts may not engage in any form of "judge-empowering interest balancing" in Second Amendment cases. *Id.* at 23. Instead, *Bruen* established a straightforward approach:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24. And the Court left no question about who bears the burden under this analysis, holding that "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17; *see also id.* at 19, 24, 58 n.25, 59 & 70.

With this year's *Rahimi* decision, the Supreme Court affirmed the one-step historical test that *Bruen* demands: "In *Bruen*, we explained that when a firearm regulation is challenged under the Second Amendment, the Government must show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation.'" *Rahimi*, 144 S. Ct. at 1896 (citing *Bruen*, 597 U.S. at 24). While the government need not hunt for identical historical laws, "why and how the [challenged] regulation burdens the right are central to this inquiry." *Id.* at 1898.

To meet its burden then, the government must produce evidence of a "*well-established and representative* historical analogue." *Id.* at 30 (emphasis added). It is not enough for the government to present a handful of marginally similar laws from "outlier jurisdictions" or laws that existed only for a short time in our history. The government must instead present evidence of "an *enduring* American tradition of state regulation." *Id.* at 69 (emphasis added). Otherwise, courts risk endorsing *unrepresentative* "outliers that our ancestors would never have accepted." *Id.* (quoting *Drummond v. Robinson Twp.*, 9

F.4th 217, 226 (3d Cir. 2021)). In *Bruen*, for example, the government presented evidence of several historical laws, including three from the Colonial Era, three from the early 18th century, three from the 19th century, and five from the Western Territories in late 19th century. 597 U.S. at 37-70. Even then, the Court dismissed the laws, emphasizing (as it had in *Heller*) that it would not stake its interpretation of the Second Amendment on historical aberrations that contradict the overwhelming weight of other evidence about the right to bear arms in public for self-defense. *Id.* at 65.

Moreover, the government cannot rely on just any historical law referencing firearms to justify its modern gun-control policy. When a challenged law regulates conduct or circumstances that existed at the founding, the government must present evidence of distinctly similar laws. The absence of such laws demonstrates that the Founders understood the Second Amendment to preclude such regulation. *Id.* at 27. On the other hand, modern circumstances that did not exist at the time of the Founding call for an analogical analysis of the government's proffered historical record. *Id.* at 28-29. Still, when assessing historical analogues to determine whether they demonstrate a relevant tradition of firearm regulation, courts must be vigilant to avoid giving the government the "blank check" *Bruen* forbade. *Id.* at 30. As Justice Gorsuch noted, "[c]ourts must proceed with care in making comparisons to historic firearms regulations, or else they risk gaming away an individual right the people expressly preserved for themselves in the Constitution's text." *Rahimi*, 144 S. Ct. at 1908 (Gorsuch, J., concurring).

Finally, because the Second Amendment's meaning is fixed according to the understanding at the Founding, the laws of that period should guide this Court's

9

analysis. Indeed, *Heller* made clear that the Founding Era was the relevant period for determining the original public understanding of the Constitution, noting that it "was written to be understood by the voters," and that "[n]ormal meaning excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." 554 U.S. at 576-77. *Bruen* affirmed this holding, reasoning that the Constitution's "meaning is fixed according to the understandings of those who ratified it," although it "can, and must, apply to circumstances beyond those the Founders specifically anticipated." 597 U.S. at 28 (citing *United States v. Jones*, 565 U.S. 400, 404-05 (2012)).

While both *Heller* and *Bruen* did examine limited evidence from the mid-to-late Nineteenth Century, they did so only to c*onfirm* "the original public understanding of the Second Amendment in 1791. *Bruen* notes that "*Heller*'s interest in mid- to late-19th-century commentary was secondary." 597 U.S. at 37 (citing *Gamble v. United States*, 139 S. Ct. 1960 (2019)). The Court treated it as "mere confirmation of what the Court thought had already been established." *Id.* Twentieth-century evidence is even less persuasive. *Bruen*, 597 U.S. at 66 n.28.

This makes sense. Obviously, "postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text … cannot overcome or alter that text." *Id.* at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)); *see also Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (noting that even "more than 30 States" adopting laws "in the second half of the 19th century ... cannot by itself establish an

10

early American tradition" because "such evidence may reinforce an early practice but cannot create one").[6]

**B.  The District Court Failed to Conduct a Historical Analysis; If It Had, It Would Have Found That Nonresidents Have Historically Not Been Required to Seek Permission Before Peaceably Carrying a Firearm**

Despite *Bruen* placing the burden on government defendants to justify their regulations by presenting analogous historical laws, the district court did not engage in any historical analysis at all. Its entire discussion of Appellants' Second Amendment claims was little more than two pages long. 1-ER-9-11.

At least one other court has ruled on this question, a state court in Massachusetts. *See Commonwealth v. Donnell*, No. 2211CR2835 (Mass. Dist. Ct. Aug. 3, 2023).[7] The *Donnell* court held that Massachusetts had failed to establish any historical laws sufficiently analogous to Massachusetts' modern disparate and second-class treatment of nonresidents. *See Donnell, passim.* But even Massachusetts has a process for nonresidents to apply for a permit, albeit one under which nonresidents receive inferior treatment compared to residents. California did not even have that much when Mr. Matthews was arrested, and thus he had no avenue to legal carry when Appellees arrested him.

---

[6] *See also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 24 Harvard J.L. & Pub. Pol'y Per Curiam 31 (2022) ("No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities remained consistent with the public understanding in 1791.").

[7] Republished online at https://www.docdroid.net/524o4XV/opinion-coffey-comm-v-donnell-pdf (last accessed Sept. 26, 2024). Following an appeal by the Commonwealth, the matter is now pending before the Supreme Judicial Court of Massachusetts.

In contrast to the proper *Bruen* analysis performed in *Donnell*, the district court here focused on the fact that Appellants never applied for a permit and that the Supreme Court "did not forbid states from applying other, reasonable, well-defined restrictions to an individual's application for a CCW license." 1-ER-10. Of course, the no-issue policy of LAPD was far from "reasonable." As for Mr. Matthews, the district court either was unaware of or ignored the substantial historical tradition of giving peaceable travelers *more* leeway than residents of the state or city they were visiting.

The examples of these "travelers' exceptions" are plentiful, and they date back to the Colonial Era. In 1686, the Province of East Jersey prohibited "privately" wearing various weapons but exempted "all strangers, travelling upon their lawful occasions thro' this Province, behaving themselves peaceably." 23 *The Grants, Concessions, and Original Constitutions of the Province of New Jersey* at 289-90 (1758). An 1813 Kentucky law was perhaps the earliest post-founding example, prohibiting the concealed carry of certain weapons "unless when travelling on a journey." 1813 Ky. Acts 100, *An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases*, ch. 89, § 1.[8] An 1820 Indiana law was similar, limiting its concealed carry ban by stating it "shall not be so construed as to affect travellers." 1819 Ind. Acts 39, *An Act to Prohibit the Wearing of Concealed Weapons*.

By the end of the Antebellum Era, three other states (Tennessee, Arkansas, and

---

[8] That law would soon be held unconstitutional under Kentucky's state constitution's bearing arms provision, but not because of the traveler exception. Rather, the state court ruled the restriction on concealed carry was unconstitutional in its entirety. "[I]n principle, there is no difference between a law prohibiting the wearing concealed arms, and a law forbidding the wearing such as are exposed; and if the former be unconstitutional, the latter must be so likewise." *Bliss v. Com.*, 12 Ky. 90, 92 (1822).

Alabama) had banned concealed carry, but provided express exceptions for travelers. *See 1821 Tenn. Pub. Acts 15-16, An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, ch. 13* ("nothing herein contained shall affect ... any person that may be on a journey to any place out of his county or state."); Josiah Gould, *A Digest of the Statutes of Arkansas* 381– 82 (1858) (describing 1837 law applying to every person "unless upon a journey"); 1840 Ala. Laws 149 (prohibiting concealed carry "unless such person shall ... be travelling, or setting out on a journey"). This tradition continued well after the Civil War. An 1867 Nevada law barred concealed carry for everyone who was not a "peace officer or traveler." *An Act to Prohibit Carrying of Concealed Weapons*, ch. 30, §§ 1-2, 1867 Nev. Stat. (Joseph E. Eckley). And an 1864 California law did the same. *See* Theodore Henry Hittell, *The General Laws of the State of California, from 1850 to 1864*, p. 261 (1868), available at *The Making of Modern Law: Primary Sources*. In 1871, Texas instituted a fine for anyone caught "carry[ing] on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for purposes of offense or defense," providing, however, that "[t]he preceding article shall not apply ... to persons traveling." *The Revised Statutes of Texas* 42-43 (1879).

In the 1880s, the Arizona Territory banned the carry of "any dirk, dirk-knife, bowie-knife, pistol, rifle, shot-gun, or fire-arms of any kind ... in any of the towns, villages or settlements" of two counties, but "provided, that any person traveling from one village, town or settlement, to another shall be permitted to carry fire-arms of any kind." 1883 Ariz. Sess. Laws 21-22. In 1887, the New Mexico Territory banned all carry of deadly weapons except that "[p]ersons traveling may carry arms for their own

13

protection while actually prosecuting their journey and may pass through settlements on their road without disarming." 1886 N.M. Laws 57.

Besides state and territorial laws, many local governments provided such exceptions too, including the cities of Oakland and Sacramento. Fred L. Button, ed., *General Municipal Ordinances of the City of Oakland, California* (Oakland, CA; Enquirer, 1895), p. 218, sec. 1, citing *An Ordinance to Prohibit the Carrying of Concealed Weapons*, No. 1141 (emphasis added) ("It shall be unlawful for any person in the City of Oakland, not being a public officer or a traveler actually engaged in making a journey, to wear or carry concealed about his person without a permit, as hereinafter provided, any pistol."); Ordinance no. 84, *Charter and Ordinances of the City of Sacramento, Prohibiting the Carrying of Concealed Deadly Weapons* (1876) ("It shall be unlawful for any person, not being a public officer or traveler, or not having a permit from the Police Commissioners of the City of Sacramento, to wear or carry, concealed, any pistol, dirk, or other dangerous or deadly weapon.").

Appellees are even out of step with the history of their own city; Los Angeles, ironically enough, was itself part of this historical tradition of exempting travelers from carry restrictions. Indeed, in 1878, the city banned all carry of certain "dangerous and deadly" weapons except by "persons actually traveling." *Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles* 83 (Wm. M. Caswell ed., 1878).

Many more examples exist, but Amici have made their point. Indeed, the exception for travelers was so widely accepted that future Supreme Court Justice Oliver Wendell Holmes, Jr. wrote that, whether or not prohibitions on the concealed carry of weapons are constitutional, carry by travelers is generally a recognized right:

> As the Constitution of the United States, and the constitutions of several of the states, in terms more or less comprehensive, declare the right of the people to keep and bear arms, it has been a subject of grave discussion, in some of the state courts, whether a statute prohibiting persons, *when not on a journey, or as travellers, from wearing or carrying concealed weapons,* be constitutional.

2 James Kent, *Commentaries on American Law* 340 n.2 (O.W. Holmes, Jr. ed., 12th ed. 1873) (emphasis added).

To be sure, many of the historical laws and ordinances were written so that they only protected travelers when they were traveling through the state or between cities in the state, and they would not apply after the traveler had stopped at a destination for more than a short time. *See, e.g.*, *Carr v. State*, 34 Ark. 448, 449 (1879) ("The exception in the statute is to enable travelers to protect themselves on the highways … Travelers do not need weapons, whilst stopping in towns, any more than citizens do."). But that does not change the result here. According to the complaint, Mr. Matthews was arrested because there was a firearm in the pocket of his driver's side door when he was pulled over by LAPD for a traffic violation. *See* Class Action Complaint for Injunctive Relief and Damages at 9, *Gary Matthews, et al. v. City of Los Angeles, et al.*, No. 22-cv-02944 (C.D. Cal. May 3, 2022), ECF No. 1. He was traveling when he was arrested.

More importantly, the Supreme Court recently affirmed that the key question is "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. Here, the relevant principle is that peaceable nonresidents get more latitude than residents of a state when it comes to laws regulating public carry. This squares with common sense; it wouldn't be fair for someone just visiting the state or who had only recently arrived (like Mr. Matthews) to

15

demand they submit to an extensive permitting process[9] before exercising their constitutional rights—particularly when they have already been vetted by their home state,[10] and the chief of police of the city they are visiting was not issuing permits to anyone regardless.

It is usually the government that argues that its challenged laws need not be all that similar to historical predecessors. For example, in many cases, state governments have argued that semiautomatic rifles can be banned because of historical concealed carry restrictions on bowie knives, even though possession of repeating rifles and revolvers (which are far more analogous to modern rifles than bowie knives are) went unregulated in the 19th century. *See, e.g.*, *Bianchi v. Brown*, 111 F.4th 438, 466 (4th Cir. 2024). If such strikingly dissimilar laws can be used to *uphold* gun laws, then certainly the historical traveler's exceptions—which were meant to protect against a similar sort of legal injury to what Mr. Matthews is now suffering—can vindicate him and confirm his arrest was unconstitutional.

## III. AMERICANS WHO LEGALLY CARRY ARE AN EXTRAORDINARILY LAW-ABIDING DEMOGRAPHIC

While the *Bruen* historical analysis is supposed to steer clear of interest-balancing analyses that appeal to public safety interests, the City might make that argument anyway. Even if *Bruen* did not exist though, the City would have a hard time justifying its no-issue carry policies as to Mr. Matthews for a simple reason—he had a CCW

---

[9] Even if he were arrested in a jurisdiction that did issue permits unlike LAPD in 2019, Mr. Matthews would have had to go through a process that takes *months* to complete (e.g., police interview, extensive background check, 16-hour training course, and sometimes a psychological exam). Cal. Penal Code § 26202, 26150, 26165, 26190.

[10] Mr. Matthews had a CCW permit issued by Tennessee.

permit issued by another state. And the data overwhelmingly show that Americans with CCW permits are extraordinarily law-abiding.

For example, in 2020, Texas had 1,626,242 active carry permit holders.[11] Carry permit holders thus made up about 5.6 percent of the state population of 29,145,505 in 2020.[12] But permit holders made up just 114 of the state's 26,304 criminal convictions.[13] That is just slightly more than four-tenths of one percent of the state's serious crimes. Even among those few convictions, most involved no gun. Of those that did, permit holders were responsible for an even smaller percentage. *See id.* For example, there were 1,441 convictions for aggravated assault with a deadly weapon in 2020, but people with a valid carry permit committed just four of those—less than three-tenths of one percent of the total. *See id.*

Other states evidence this trend too. As of August 2024, Florida had issued 6,144,365 concealed weapon permits since October 1, 1987. Of those, 2,449,492 are still active today.[14] In that 37-year period, only 20,621 permits have been revoked

---

[11] *See Active License/Certified Instructor Counts as of December 31, 2020*, Tex. Dep't of Pub. Safety, https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/actlicandinstr/activelicandinstr2020.pdf (last accessed Sept. 15, 2024).

[12] *See Texas: 2020 Census, Texas Added Almost 4 Million People in Last Decade*, U.S. Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/texas-population-change-between-census-decade.html (last accessed Sept. 15, 2024).

[13] *See Conviction Rates for Handgun License Holders, Reporting Period: 01/01/2020 – 12/31/2020*, at 5, Tex. Dep't of Pub. Safety (Feb. 11, 2021), https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/convictionratesreport2020.pdf (last accessed Sept. 15, 2024).

[14] *See Concealed Weapon or Firearm License Summary Report Oct. 1, 1987-Aug. 31, 2024*, at 1, Fla. Dep't of Agric. & Consumer Servs., Div. of Licensing (June 30, 2023), https://ccmedia.fdacs.gov/content/download/7499/file/cw_monthly.pdf (last accessed Sept. 15, 2024).

without being reinstated, or roughly three-tenths of one percent of the total issued. *See id.* Florida statistics are notable because it is the state where the modern right-to-carry movement gathered steam. The state's enactment of "shall-issue" permitting was met with predictions of wild-west style violence and "blood in the streets," but none of that happened. At least one prominent opponent of the law admitted his error. Representative Ronald A. Silver stated in 1990 that "[t]here are lots of people, including myself, who thought things would be a lot worse as far as that particular situation [carry reform] is concerned. I'm happy to say they're not." Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679, 692-93 (1995).

The trend of law-abiding CCW holders is not limited to "red states." The Chicago Tribune reported in 2020 on all known uses of a gun (shootings or threats) by the 315,000 people in Illinois with CCW permits.[15] The Tribune found just 71 incidents between 2014 and 2020. *See id.* And many incidents listed were not crimes, but legitimate self-defense uses. For instance:

> Elvis Garcia, 39, was talking outside with neighbors ages 20 and 27. Two men drove up and started shooting at them; all three were hit. Garcia, a CCL holder, returned fire, killing Michael Portis, 17. Both Garcia and Portis died from their wounds. The second man who fired at the three neighbors later was arrested.

*Id.* But even if all 71 incidents were crimes, that would come out to CCW permit holders

---

[15] *See* Katherine Rosenberg-Douglas, *Explore: Shootings by CCL Holders in Illinois Since Concealed Carry Law Went Into Effect in 2014*, Chic. Trib. (Mar. 1, 2020), https://www.chicagotribune.com/news/breaking/ct-viz-illinois-ccl-shootings-tracker-20200227-ww4ldqwdjrd2ze63w3vzewioiy-htmlstory.html.

in Illinois having a two one-hundredths of a percent chance of committing a crime using a gun at any point in the six-year period the Tribune examined.

Minnesota's Permit to Carry holders are in a unique position, as every crime they commit, whether or not a firearm was involved, is meticulously tracked and reported by the Minnesota Bureau of Criminal Apprehension (BCA). This level of oversight provides an unparalleled dataset, allowing for the most direct comparison between the criminal activity rates of permit holders and the general population. In 2023, the BCA's Uniform Crime Report[16] showed that for crimes against persons, the general population had a rate of 856.9 per 100,000 people, while the BCA's Permit to Carry report[17] shows permit holders had a much lower rate of 89.2 per 100,000—*nearly 10 times lower*. When isolating instances where the permit holder had a firearm during the offense, the rate plummets to 8.6 per 100,000. This makes permit holders almost *100 times less likely* to commit crimes against persons while carrying a firearm.

Similarly, for crimes against property, the general population had a rate of 2,747.2 per 100,000 people, while permit holders had a significantly lower rate of 44.3 per 100,000—*a difference of more than 60 times*. When focusing on cases where the permit holder was carrying a firearm, the rate drops to an astonishing 0.9 per 100,000, making permit holders *3,000 times less likely* to commit property crimes while carrying.

---

[16] *BCA Releases 2023 Uniform Crime Report*, Minn. Dep't of Pub. Safety (Aug. 15, 2024), https://dps.mn.gov/divisions/ooc/news-releases/Pages/BCA-releases-2023-Uniform-Crime-Report.aspx (last accessed Sept. 30, 2024).

[17] *BCA Releases 2023 Permit to Carry Annual Report, Data Provided to BCA by Minnesota Law Enforcement Agencies*, Minn. Dep't of Pub. Safety (Mar. 1, 2024), https://dps.mn.gov/divisions/ooc/news-releases/Pages/BCA-Releases-2023-Permit-to-Carry-Annual-Report.aspx (last accessed Sep. 30, 2024).

Similar data exists for many other states,[18] and data to the contrary is nonexistent. As a result, several courts have recognized the lack of evidence supporting efforts to tie criminality to those lawfully carrying for self-defense. "[D]espite ample opportunity for an evidentiary hearing, the State has failed to offer any evidence that law-abiding responsible citizens who carry firearms in public for self-defense are responsible for an increase in gun violence." *Koons v. Platkin*, 673 F. Supp. 3d 515, 577 (D.N.J. 2023). "Simply put, CCW permitholders are not the gun wielders legislators should fear." *May v. Bonta*, No. 23-cv-01696, 2023 WL 8946212, at *19 (C.D. Cal. Dec. 20, 2023). "[T]he vast majority of conceal carry permit holders are law abiding." *Wolford v. Lopez*, 686 F. Supp. 3d 1034, 1076 (D. Haw. 2023).

At least one research organization that typically argues for more gun control, RAND, has recognized the same. "[E]vidence generally shows that, as a group, license holders are particularly law abiding and rarely are convicted for violent crimes." Rosanna Smart, et al., *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effect of Gun Policies in the United States*, at 427 (4th ed. 2024), available online at https://www.rand.org/pubs/research_reports/RRA243-9.html (last accessed Sept. 27, 2024).

Visitors like Mr. Matthews who have CCW permits issued by other states are not a danger to the city of Los Angeles. His arrest was as unjustified on public safety grounds as it was unjustified on constitutional grounds.

---

[18] *See, e.g., Department of Justice Concealed Carry Annual Report - 175.60(19): January 1-December 31, 2022*, at 1-2, Wisc. Dep't of Just., https://www.doj.state.wi.us/sites/default/files/dles/ccw/2022%20Annual%20CCW%20Statistical%20Report.pdf (last accessed Sept. 15, 2024) (data showing Wisconsin has similarly low crime rates among those with CCW permits).

## CONCLUSION

For these reasons, Amici urge this Court to reverse the district court and allow Appellants to continue to pursue their claims against the City for their unconstitutional arrests that violated their Second Amendment rights.

Dated: October 15, 2024                Respectfully submitted,

                                      **MICHEL & ASSOCIATES, P.C.**

                                      /s/ C.D. Michel
                                      C.D. Michel
                                      Anna M. Barvir
                                      Konstadinos T. Moros
                                      MICHEL & ASSOCIATES, P.C.
                                      180 East Ocean Blvd., Suite 200
                                      Long Beach, CA 90802
                                      Telephone: (562) 216-4444
                                      Email: cmichel@michellawyers.com
                                      *Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-3874

I am the attorney or self-represented party.

**This brief contains** | 6,054 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ C.D. Michel | **Date** | October 15, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2024, an electronic PDF of BRIEF OF AMICI CURIAE CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, SECOND AMENDMENT LAW CENTER, INC., THE SECOND AMENDMENT FOUNDATION, AND MINNESOTA GUN OWNERS CAUCUS IN SUPPORT OF APPELLANTS AND REVERSAL was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

Date: October 15, 2024       **MICHEL & ASSOCIATES, P.C.**

/s/ C.D. Michel
C.D. Michel
*Counsel for Amici Curiae*

23